## *In re* Soldiers' Compensation Appeals.

Nos. 25,550, 25,552, 25,566, 25,636, 25,638, 25,639, 25,640, 25,641, 25,648, 25,674, 25,682, 25,683, 25,687, 25,688, 25,690, 25,692, 25,714, 25,719, 25,736, 25,742, 25,765, 25,796, 25,804, 25,827, 25,836, 25,853, and 25,863.

### SUPPLEMENTAL MEMORANDUM OPINION.

*Per Curiam*—Dawson, J.: Decisions in these and other soldiers' compensation appeals were announced as the court was about to adjourn in July. (*Ante,* p. 601, 227 Pac. 1117.) The number and variety of the questions then presented made it impractical to write a formal opinion without delaying the decisions and consequently retarding the official business of the compensation board.

Turning now with more time at our command to review our summary despatch of these cases, the court is inclined to hold that little more needs to be written. In *Horvat v. Davis*, No. 25,550, and similar cases, it should need no amplification of mere words to demonstrate that a soldier who holds an honorable discharge is not to be denied compensation because some functionary of the federal government, without authority, scribbled across the face of that honorable discharge the words, "Not a citizen of the United States." Such a recital might similarly have been written across the discharges of Lafayette, Kosciusko, John Paul Jones, and other alien heroes of the Revolutionary War. Instead of that, however, Lafayette in his old age visited this country in response to an invitation of the president, and congress made him a gift of $200,000 in cash and a township of land. (Act of Sec. 28, 1824, 6 U. S. Stat. at L. 320.) We have no present concern with claims of alien soldiers holding other than *honorable* discharges.

Anent the case of *Bonar v. Davis*, No. 25,638, and others involving

the question of the period for which compensation should be paid, the original compensation acts (Laws of 1921, ch. 255; Laws 1923, ch. 200), left indeterminate the period of national emergency for service during which our Kansas soldiers should be paid. That matter was partly clarified by fixing a limitation date for such payments at June 30, 1919. (Laws 1923, special session, ch. 5.) But of course, if a soldier's term of enlistment had expired after the armistice and prior to June 30, 1919, he could have no just claim on the compensation fund for services after the date of his discharge. If the claimant had adopted the military profession as a career, which might or would necessitate successive enlistments, such a reënlistment would not extend the period for which he might draw compensation from the state of Kansas. This view should become clear if it is kept in mind that the constitutional questions involved in the compensation act were only surmounted and the act justified as an extraordinary expense incidental to the defense of the state in time of war. (*The State, ex rel., v. Davis,* 113 Kan. 4, 213 Pac. 171.) So far as the individual soldier was concerned, under the theory of a constitutional emergency justifying the payment of public money to him, his claim could not well be recognized beyond the date when he received a discharge from the army, although as a soldier by profession he immediately and voluntarily entered upon a new enlistment.

It may be well to amplify somewhat the controlling feature of *Molinar v. Board,* No. 25,736. In 1917, Molinar filed on a half section of government land near Ordway, in Colorado, built a small house on it and took up his abode thereon in conformity with the federal homestead act. Shortly thereafter he registered for the draft as a citizen of Colorado, and was inducted into the army in September, 1917. He testified:

"When I was discharged I received travel pay to either Ordway, or Olney Springs, Colo. I tried to get travel pay to go to Girard, Kan., but they would not give it to me. They said they got me at Ordway and they would send me back there. That is where I entered the service. . . . When I enlisted they asked me where I lived and I told them 'on my claim at Olney Springs, Colorado.' . . .

"After I went into the army I just let my claim stay there, and when I got back I got the deed to it and the claim is now mine. I received the patent from the United States Government, because they gave me credit for the time I was in the army and had actually lived on the claim only about four months. Now I have a patent to 320 acres of land in Colorado."

The record shows some effort to prove that Molinar's venture on the public domain in Colorado was to acquire some oil rights or mining land. But oil or mining rights in the public domain are not acquired by homestead settlement nor are oil or mining lands patented in half section lots to entrymen because of actual residence thereon or its equivalent—service in the army. If such a claimant could establish a right to compensation as a resident of Kansas, and "get by" with it, the administration of justice would be sadly discredited. Molinar's case involves mixed questions of law and fact. Only a *bona fide* settler who takes up his abode on government land, to the exclusion of a home elsewhere, can acquire and perfect his right to such land. Molinar conformed to the federal law and the land was patented to him. His avowed intention and his conduct coincided. He received the benefits of such coincident intention and conduct—a patent to 320 acres of government land. Now he is morally estopped to say: "I lied to the officials of the United States land office. I never complied or intended to comply with the United States homestead law. I only went through the form and signed some papers, and put a shack on the land for the purpose of defrauding the government out of 320 acres of land." And if the Kansas compensation board and the Kansas courts should take him at his word, and concede that he never was a *bona fide* entryman, homestead settler and patentee of government land, and give him compensation as a Kansas soldier and resident, what is to hinder him, if the government should prosecute him for perpetrating a fraud, from taking the position that all his conduct with reference to his Colorado settlement was genuine and done in good faith and that his duplicity was solely against the state of Kansas for the purpose of getting an allowance of compensation as a Kansas soldier? And this farce would not necessarily end there. If afterwards prosecuted for defrauding the state of Kansas, what would prevent him from taking the position that his attitude toward this state had been uniformly upright and that whatever he had said to excuse himself in a federal prosecution for fraud had been false and done merely for the purpose of defeating the government? For two outstanding reasons, therefore, the judgment of the trial court cannot stand. Under the record, Molinar was not and could not have been a *bona fide* resident of Kansas at the time he entered the army for service in the World War; and a judgment which is

morally wrong and which would seriously tend to bring reproach on the administration of justice should never be permitted to stand. Either view of this case compels a reversal of the judgment. The case of *Croan v. Board*, No. 25,674, is governed by the same principles and it, too, is reversed.

In *Winkler v. Board*, No. 25,714, and similar cases, where the claimants were enrolled in the naval reserve but not called into active service until after the armistice, it ought to be perfectly clear that such claimants are not entitled to compensation. They are outside the letter, the spirit, the purpose, and the constitutional justification of the compensation act. The case of *Dew v. Davis*, 115 Kan. 219, 222 Pac. 750, was altogether different. Dew was regularly enlisted in the navy, and although temporarily sent home he was always under orders and on full pay as a regular sailor. While at home in obedience to orders he was substantially in the same status as a soldier on furlough. Such was not the status of Winkler and the other claimants who were enrolled in the naval reserve but not called into active service prior to the armistice. They were not under naval or military law; they were not even in uniform. Their status was more nearly like that of registrants under the draft act than like that of regularly enlisted members of the army or navy.

In *Doniphan v. Davis*, No. 25,690, the controlling question was purely a case of disputed facts—whether the claimant was a resident of Kansas City, Kansas, or Kansas City, Missouri. The trial court held that the claimant was not a resident of the state of Kansas at the time he entered the army during the World War within the meaning of the compensation act. It is not denied that there was some substantial evidence to support that judicial finding. Claimant had been and was a resident of Kansas from 1911 to December, 1917. On that date he moved from Kansas City, Kansas, to Kansas City, Missouri, where he has ever since resided. Under such a situation the trial court's determination of the facts is conclusive. Were it otherwise it would be difficult for this court to arrive at a conclusion different from that reached by the trial court in this case.

We discern nothing further in these appeals to justify discussion, except in *Parrish v. Board*, No. 25,683, in which a motion for a rehearing has been filed and sustained.

BURCH, J., and HARVEY, J., adhere to their dissents indicated *ante*, p. 601.